Good morning. May it please the Court, my name is Abraham Mardidi. I represent the appellant Abel Girmai. I'd like to reserve three minutes for rebuttal, if I can. This appeal arises out of the layoff of Mr. Girmai by NW Airlines on September 28, 2001, approximately two weeks after the tragic events of 9-11. Of the six candidates for layoff, in his particular job title, Mr. Girmai was the only one who was foreign-born. He was the only one who spoke with the accent, a matter that had been a subject of commentary for him at NW for several years. He was from a country, Ethiopia, which is largely Muslim, approximately 40 percent Muslim. Our country probably experienced a greater fear of people from abroad immediately after 9-11 than he has. What does the religious makeup of the country have to do with the case? Because it's a national origin case. And he's from a country. Is he Muslim? No, he's not. No, it's not in the record. Pardon? It's not in the record. No, his religion is not in the record. No, that's correct. So, okay. All right. And perhaps most important of all, he was a stellar performer. There are two primary issues on this appeal. They both arise out of a summary judgment of the dismissal or a summary judgment dismissing the entire case. His, the first issue is whether the court did find or hold, and NW does not dispute, that Mr. Girmay made a prima facie case of discrimination on the basis of race or national origin. However, the other issue on appeal is whether he showed pretext adequately. I'm puzzled by your comment that he's a stellar performer. He is. I had the impression he had the lowest rating of all of the APMs. Not correct. He didn't have, what, 3.21? What he had was a 3.25. There was an APM, Karen Klein, who had a 3.2. Well, they had hers 3.35, didn't they? Because they changed it. That's part of our showing of pretext, is on the face of the case. They say they changed it. They say they adjusted it to compare apples to apples. Well, that's not the testimony below. The testimony below was that Ms. Jones testified that she changed it because she thought there was a mathematical error in it. That appraisal had been done in Tampa where Ms. Well, she did it on the basis that she should have 100 percent if you're dealing with a whole. Well, but I don't There was a reason for her to look at it. Now, I understand your argument that she should have called the people and if she was serious, she shouldn't have changed it without calling the people in Tampa and find out what's going on. But there was a reason to look at it. There wasn't 100 percent on the issue. There was a reason, but you have totally different matrices for comparison out of Tampa and Seattle. So, you know, you can say The forms were different or the criteria The forms were different. The criteria were different. In the goal portion of the assessment, the weighting for different factors were different. We don't know whether there was any relationship between the goals set for the Tampa assistant managers and the goals set in Seattle. So if you're really looking to compare apples to apples and oranges to oranges, you make some inquiry. You convinced me she's not a statistician, but how do you show that this was motivated by racial or national origin animus and not by kind of ineptness? Well, first of all, she's departing from an established practice. You know, you have a practice and on the face of the performance appraisal, it says what the rating is. The moment you go beyond what the performance appraisal itself shows and you begin to pick and choose numbers, as Ms. Jones not only did with this particular employee, but with another and round up or round down or add or subtract, you're in dangerous territory. There's really no, simply absolutely no criterion What do you peg as the established practice? The established practice is to look as to round up or down in comparing the core, in combining the core competency and the goal, and you take the overall rating from the form of the appraisal. And if you do that, then Mr. Germay was not the low performer. He was either second from bottom or third from bottom. Yeah, but if in fact it was just a mistake, she's just poor at math, you have to have something more than a mistake. It seems to me We have plenty more And one of the things you look at is she made errors and flanneries, but I don't see where that's going to be relevant to you. He's white and your client's black and it looks like she makes mistakes for everybody regardless of their background. Does that really help you any to show pretext? I think it does for a number of reasons. First of all, we have more than that. We have the constant comments on his actions I understand. We can go to another issue, but I just and I'll get to that. But on this one, I didn't quite understand the argument because she also made mistakes, mathematical mistakes with flannery, that somehow that is a part of the pretext. The argument is simply this, that they claim, Northwest claims, that they used the same procedure to select Flaherty for layoff, she's white, as Gramey for layoff. That's the statement. But if you look at what they actually did, they didn't really do that. If you do the math, it shows that she had one procedure that was designed, apparently, to select Mr. Gramey for layoff. And flannery? No, they used a different procedure for Flaherty. That's the point. But she made mathematical mistakes and he loses out. They say it was not a mathematical mistake. I understand what they say, but I'm on your case now. Okay, I understand. I should point out, in their brief, they affirmatively state that there were no mathematical errors. It struck me that if she does the same poor math for a black man and a white man, that maybe she's just a poor mathematician. I'm not sure how that pushes the pretext issue. Well, you know, both of the, if Flaherty was a sales performance manager, she was in a different job. And both candidates for layoff in that job, Flaherty and Skidinski, were white. So, you know, she certainly wasn't favoring an African-American when she made that mistake, if it was a mistake, as opposed to a manipulation. Well, I suppose it's hard to see that she's prejudiced against African-Americans when she's an African-American. So I suppose it really gets down to the accent issue. Now, is accent issue dealing with origin, place of origin? Is that how it fits in? Both. Both race and national origin. And I think I've answered the question. I'd like to go back to your earlier comment. The Supreme Court has told us in no uncertain terms, in the Oncali case, which was based, in turn, upon Castaneda versus Parteta, a national origin case, that it's improper to assume that members of one minority group or one group won't discriminate against another. And the Seventh Circuit has gone farther and told us in Johnson versus Zima Corporation that there shouldn't even be an inference that people of one group won't discriminate against people of that group. Of the same group. Of the same group. Right. So then, to go back to the accent issue, we have claims under our state statute against discrimination, RCW 4960, under Title VII, and under 1981. Accent is a national origin under the first two statutes. It's a race issue under 1981 because the U.S. Supreme Court has told us that race, as used under 1981, implicates a 19th century definition, which is ancestry. And this Court, on at least two occasions, has indicated that accent is an actionable basis for a claim under 1981. In other words... Separate from origin. Absolutely. 1981 does not encompass pure national origin claims. Obviously, ancestry and national origin often overlap because if you come from a country that's largely one group or stock of people, then the national origin and the ancestry is going to be the same. But that's not always the case. And when it's a pure national origin issue, it's not a 1981 claim. Okay. Thank you. That's helpful. Well, how does the accent play into this, then? Well... The comments, you know, look, some of the comments were not negative in the performance evaluations. There were comments about, well, you need to improve. It would help if you sort of worked on your English skills. What's wrong with saying that? I mean, what's the negative implication of that? I'm glad you... It could be viewed as a positive statement. Look, you know, you've got to improve your English skills in order to be successful. That's not... First of all, what's on the appraisal is not the only comments. Many of the comments were oral and were sarcastic in Mr. Gramey's description. Mr. Gramey repeatedly told Ms. Jones that he couldn't change his accent. He was not, you know, a child when he came to this country. He said English was his fourth language. Exactly. And so she was carping on something that couldn't change. Beyond that, on summary judgment, if there's an inference as to whether this is a helpful or a beneficial comment as opposed to a negative one, you draw the inference in favor of the non-moving party, the employee. And the Rod case... Excuse me, I didn't mean to interrupt you. Go ahead. The Rod case, also a Ninth Circuit case, expressly addresses that. And in that case, the district court held that a comment on accent wasn't negative, wasn't critical, because the particular manager in that case had been friendly toward the employee. And this court reversed on that point. What were the worst comments made about his accent? Just, you know, you've got to get rid of it, it's impeding this, it's impeding that. Well, suppose that's true. Suppose that we're impeding people's ability to understand him. It's not. Well, that's what you say. I mean, they say it's impeding him. No, it isn't just what I say. It's what Ms. Jones says. Ms. Jones testified... It's hard to understand. The guy had a job where he's on the telephone, right? He's a telephone... Yeah. That's... If it impeded his performance, it's a legitimate thing to take account of. So they said to him... The worst thing that they said to him was your accent is impeding your performance? I can't give you an exact quote. That's pretty important, isn't it, to know? I mean, this is what gets you from a mere mathematical error into a racial animus. No. I'll tell you the reason. Because Ms. Jones herself conceded, in deposition, without hedging her qualification, that the accent did not make it difficult to understand Mr. Girmay. So the moment she's saying, you know, this is making it hard for you to give a presentation or being understood, you have to assume, given the summary judgment standards, that she's harping on him, that she's basically telling him something untrue. Once she admits in deposition, which she did, and every single other manager and person in this case who was opposed did the same thing, once you admit that it doesn't impede his performance or make it hard for him to be understood, then any comment beyond that is impermissible. Assume that he would be even better if he took a grammar course. Well, it wasn't grammar that was the issue. Communication, oral communication. Suppose he could be even better. There's nothing wrong with an employer suggesting improvements in different areas, is there? When it's based on a stereotype, there sure is. I mean, that was the lesson of Hopkins versus Price Waterhouse. There, the employer was telling the employee, you need to dress more femininely, you need to do this, you need to do that. Well, we understand that. But we're talking about communication skills. And in fact, in April and May, when he said that she was talking about the accent thing, in June, she gave him an increased rating in communication skills. Well, it may have been a better one than he had before, but it wasn't up to where he should have been. Plus, all of these are very subjective criteria, and you have to assume that if her subjective views as to his communication skills are spilling out in her comments on accent, then they're spilling out in other areas of subjective assessment as well. And perhaps when you really look at things, he should be getting a five on communications rather than a three. This is a guy who was a top performer in telephone sales. What I'm suggesting to you is this may be a Manat case where some of the things she said sort of breaks the chain. And I suppose that's an issue that you need to consider because in April, he talked to Edberg. In April and May, there was the accent problem. And in June 28, he mentioned that she had bias on the e-mail. It was after that that she got the Jones gave him a higher communication skill. And it was after that that she was involved with the graduation gift and complimented him. Well, the graduate... Does that put us in a position of Manat? No. Why not? Well, I mean, what I remember of Manat was that it was largely a harassment case. Pardon? Manat was largely a harassment case. Well, I understand Manat. I was on the panel. Yeah. But the Manat issue is that if these other things are in there, they tend to dissipate any indication of bias. And I just want to have you respond to that. Sure. These issues occurring after, that is, that she gave him higher communication skills, they congratulate him on his achieving his graduation. Why wouldn't that be a Manat problem that would dissipate the probability or possibility of earlier bias? Well, first of all, the graduation thing, you know, she chipped in for what's like a toy dog, I think it was, and along with some of the other managers or all the other managers, and Mr. Germay testified that he gave them all the same note, thank you for your words of appreciation or your kind words or something, and all the same gift. That's the first thing. The second thing, again, you know, if there was a slight improvement in his communications thing afterwards, if he was starting from a disadvantage, it really doesn't cure the problem. I don't think that he has to show that his managers were complete ogres in order to prevail on either of his claims, nor does he have to show that they, you know, metaphorically flogged him every day. I mean, that's just not human nature. All he has to show is that those things that he did in making internal complaints and in filing his first lawsuit, and those things about him, such as his accent, his race, his national origin, put him at a disadvantage, and enough of a disadvantage that made a difference. Again, if you look at all of those figures, the ratings of all six APMs were very, very close, and it doesn't really take very, very much, I don't think, to show, or he wouldn't have to show an enormous amount of bias to show that it really influenced the outcome of the court. To get past summary judgment. Well, certainly to get past summary judgment, or even, you know, to get to trial. And I just, I have to say that this is a guy who really achieved a lot in his life. He fled. It looks like if you get past summary judgment, you're going to go to trial unless you settle the case. Correct, yeah. But he sort of lived in a country. He had to flee what was called the Red Terror in Ethiopia. He came to this country. He made it on his own. He got a master's degree while he was working full time. Everything he got at Northwest, he had to fight for. He applied for 20, 25 promotions, and then finally sued to get one, and only at that point was he promoted. Did you want to reserve some time for rebuttal? Yes, I'll do that, and I'll end now. Thank you very much. Thank you. Good morning. Good morning, Your Honors. My name is Ken Diamond, and I'm here on behalf of Northwest Airlines. Judge Peckman properly granted summary judgment as to all of Mr. Gramey's claims, and her decision should be affirmed. In my view, what this case is really about is that Mr. Gramey is unhappy. He was disappointed. He was angry with the fact that he was one of the two people selected for layoff after September 11th. And he's trying to translate those emotions into cognizable claims, and Judge Peckman properly concluded that it doesn't work. Do you agree with Mr. Arditi that it was deposition testimony that his accent didn't impair his work? Well, I want to comment on that specifically, Your Honor, because there are a lot of comments by Mr. Arditi about there being persistent comments and Ms. Jones harping and the rest of it. But Mr. Gramey needs to present specific and substantial evidence, and if you look at the record, there are two comments alleged that Ms. Jones made to Mr. Gramey. Two, one of which she said, allegedly, your accent is getting in the way, and the other she said some of the agents were having trouble understanding you because of your accent. Those were the comments. What does he say at the deposition about his accent? She said at the accident, she said at her deposition that she did not have trouble understanding him. That is what she said. Mr. Arditi talks about the communication scores that Mr. Gramey received on his performance review. The fact of the matter is that he got four reviews from Felicia Jones, three of them, including the last one, which is the only relevant one. She gave him a three, which means he was meeting expectations and standards. Other APMs got threes as well. Mr. Arditi says he should have gotten a five. No one got a five. A few people got a four. He was not the only person who she made constructive comments to about developing their oral and written communication skills. I mean, these people are managing. That's a very logical thing to suggest. It doesn't have anything to do with national origin. It doesn't present any sort of animus. And none of the case law that Mr. Gramey presents in his papers supports it. Can you explain to me how Ms. Jones actually selected Mr. Gramey? Yes, I can. And why you take the position in your brief that there were no mathematical errors. Sure. It appears that there are mathematical errors, but you say there were no mathematical errors. And to be honest with you, I tried to work through each one, you know, following the argument, and it's confusing to say the least. Okay. So which leads you to the, you know, one could draw an inference from that, that Jones selected a method that would ensure that Gramey was the one who was going to be at the bottom of the list. Yeah. Let me speak to that, because I think that does go to the heart of the matter. And the fact is that Ms. Jones did use a consistent process, which I'll explain, and an entirely logical one. The short of it is September 11 hits, there are massive layoffs, the airline industry is upside down, et cetera. She's tasked with reducing her management staff by two. Okay. So what's she going to do? By 4 September 11, she wouldn't have terminated anyone, because all of their performance was generally fine. But she has to get rid of two people. So she says, okay, I'm going to look at the most recent performance review. But why should I do that? Because, number one, it's the only performance review that all the APMs have since the job itself changed in November of 2000. Number two, because some of the APMs didn't have prior reviews. Number three, in April of that year, when Crystal Yost, who was Caucasian, had not sued the company and was not from Ethiopia, had been terminated in an economic layoff, they had looked back to the most recent performance review.  In that case, with Crystal Yost, as we explained, Iris Palombaret was first, and Mr. Germain was second, and Ms. Yost was third. But in that case, you could determine it off of the rounded scores and didn't need to go to the raw scores. So Ms. Yost was the one who was selected for layoff. Okay. Now we're in September of 2001. Ms. Jones takes the reviews that she had done prior to September 11, prior to the fact that there would be a need for layoffs. She decides she's going to terminate one sales performance manager. So that's either going to be Mr. Skidinski or Ms. Flaherty, and she's going to terminate one of the six APMs. Okay. She looks at the scores, and she decides that she's going to use the raw scores. And for both the APMs and the manager? Yes. And I'll explain that. And the reason is because the rounded scores result in ties. So there's no way to determine it other than, in her judgment, to go to the raw scores. And the raw scores do differentiate. In other words, someone can have a 3.33 that rounds down or a 3.14 that rounds up, and so there are some differences there. Now, Mr. Arditi said, well, they were deviating from a standard practice, but Judge Peckman correctly found that they weren't. There's nothing in the record to suggest that previous layoffs had been done in some sort of different manner than this. And the fact that the performance reviews were done using rounded scores is entirely separate from the fact that, in this instance, with these layoffs, she was going to use the raw scores. All right. The way the performance reviews work, you have the competency rating, which is the individual scores. Core competencies. Core competencies. Then you have the goal rating, which is a combination of team and company and individual. And that gets you to your overall performance rating. The way it was done for performance evaluation purposes, the overall competency rating was rounded to the nearest half point. The goal rating was left in its raw form. Then those numbers were taken, and the overall performance rating was rounded to the nearest quarter point. Okay. So when Ms. Jones decided on the procedure she was going to use, one from each position, most recent performance review, need to go to the raw scores, that's what she did. And it is true that there is an incorrect number on Mr. Skidinski's goal rating. It says 3.45 when it's actually 3.25. But it's a distinction without a difference. Because the fact of the matter is that when you do what Ms. Jones did, you end up in the same place. Mr. Skidinski's competency rating was higher than the 3.5, was rounded down. Ms. Flaherty's was lower and was rounded up. The goal ratings, Ms. Flaherty was 3.35. Mr. Skidinski was 3.25, although the number on there was 3.45. But the point is, if you take those and you calculate it out, they both ended up with a 3.5 rounded overall score, even with that transposition of numbers corrected. Okay. So you end up in the same place. They both had the 3.5 rounded overall score. So she goes back to the raw scores and you take his raw competency score, which I believe was 3.55, his raw goal score, 3.25, you calculate, you do the same for her, he still has the higher raw score. So it doesn't change anything. You go to the APMs and it's exactly the same analysis. You take the raw score, the raw score, you end up with the raw score. So it was done exactly the same. That's how it was done. And it was done exactly the same way for Ms. Flaherty as it was for Mr. Girmay. And I'm sure that Ms. Flaherty was no happier than Mr. Girmay about the fact that she ended up on the short end of the stick. Now, how did Ms. Jones decide that with respect to Ms. Klein, she would just add in the necessary, I think it was .3, to total 100 points, or 100 percent? Her testimony was that when she received the review from Tampa, she wasn't the one who did the review. And, you know, frankly, if she was going to use that as some sort of a ruse, I mean, she didn't have to use Ms. Klein's at all. She could have just taken the position, well, I didn't review her, so let's put her to the side. But she did include her in an effort to be fair about the whole thing. And consistent with being fair, she did exactly what she did with the Seattle APMs, is she took the raw scores for each and every category. They added up to 100 percent. She divided and she got their raw number. With Ms. Klein, it is true that in Tampa, the overall rounded score that was put on the front of the paper was done differently. They only included 90 percent and didn't include that 10 percent. It was Ms. Jones' judgment that the fair thing to do, since she was taking – she wasn't taking what was on the front page for the Seattle people. She was taking each raw score, adding them up 100 percent, was to do the same thing for Ms. Klein. It's an entirely reasonable thing to do. Do you think that reasonable determination can be decided on summary judgment? Absolutely. Why? Why the – Why isn't this enough to raise a genuine tribal issue of fact? What, that specific issue? This whole – add that to what you just went over, all these calculations, the fact that the end result was that it was Mr. Jermai. Why isn't all of this sufficient to raise a tribal issue of fact for the trial – for the prior fact to decide whether all of this is true? Because, Your Honor, the case law is clear that Ms. Jones is the decision-maker. She gets to decide how to do it. Mr. Jermai might have done it differently in a way where he would have stayed and someone else would have gone, but that's legally irrelevant. She decided how she wanted to do it, and she did it in a way that is entirely logical. It was her decision to make. It could have been done the same way, to get Klein in a different position so that the plaintiff would be terminated. It could have been. Well, it could have been done a number of ways to end up with someone else. That's the difficulty that Judge Paez points out. If you were defending this case after a trial, your argument would be very persuasive. But look what happens down in the district court on this very issue. Second, the purported, quote, manipulation, close quote, of Ms. Klein's scores appears to be no more than a normalization process to enable Ms. Jones to compare the employees on equal footing. It appears to be. Isn't she drawing inferences as to whether or not it's pretext or not that she's not allowed to do on summary judgment? I don't believe she is. Her language is what it is, Your Honor. But I think if we step back from it, again, Felicia Jones is entitled to proceed in a legitimate, reasonable, logical manner. And the court isn't so... On summary judgment, all you have to do is find an issue in dispute, and you get by. A material issue in dispute, you get by to the trial. And we've been very clear that in these cases, that burden is not very hard. And she is here telling us that she's... The arguments, both separately, do not establish by a preponderance of the evidence that Northwest's reasons for terminating Gamaliel were protection. By a preponderance of the evidence. And then, over on deciding on the accent, fourth, the court finds little weight to the alleged comments on Mr. Grimari's accent. It seems to me that the district judge may have been not assessing this as a summary judgment issue. Is that right? I think she was, Your Honor. I have great confidence that Judge Peckman understands the analysis. Well, I'm sure we all have confidence that she's a wonderful judge. But I'm just going by what she says. That a discriminatory reason is more likely motivated by the employer, or the employer's profit explanation. These are all the comments we usually find after a case has been decided. And I'm just struck about giving little weight to the accent issue. This doesn't look like a summary judgment response. Can you tell us how we're to... And while I've got you on the line, the other issue that bothers me is the e-mail complaints. She says that the e-mail complaints are not a protected activity. This is just discussion among the group. Our Wray case is directly contrary to that. Our Wray case says that making an informal complaint to a supervisor is also protected activity. Now, with that, how are we going to get by that there isn't sufficient of a low threshold to show pretext that should have gone to the jury? Okay. First, Your Honor, as to Judge Peckman, I think the Reeves decision from the Supreme Court does talk about weight, and there is a job that the district court needs to do. And I think Judge Peckman did that. I think regardless, of course, it's a de novo review before you, and I would submit to you that with different language that you would reach the same result. In terms of... I'm sorry, I lost the last question you asked me. Oh, that's on her decision that this is... Oh, the e-mail. It's not protected activity. On the e-mail. And we have on Wray just the opposite. No, it's not, Your Honor. And again, it really requires looking at the record because in that e-mail, all that happened is someone had raised an issue about whether Mr. Germay was talking about something. You can see Ms. Jones was in Minneapolis, asked someone to look into it. Mr. Germay, in the context of just a very simple workplace issue, says to her, I don't believe your approach to this is free from bias. That's what he said. And there's nothing that mentions national origin. There's nothing that mentions retaliation for the Orr's lawsuit. There's nothing that mentions race. And we've cited authority that requires that. And I think Judge Peckman was saying that there has to be some... I mean, she's saying a couple of things, but one of them is there has to be some reasonable basis. You agree first the district judge is wrong. This is a protected activity. What you're arguing is that it does not show that he is actually making the types of comments that raise to protected activity or that cause bias. Well, I'm saying a couple of things. I'm saying that e-mail is not protected activity because he's not tethering it to anything. He's just saying, I think this is bias. And we've cited a case that says you've got to tie it to something. You can't just make this statement. I think you don't like me. I think this is bias. I don't think that is a protected activity. Second, I think the case law is clear that it needs to be objectively reasonable in order to be protected activity. Whereas he's just taking anything she does. She's responding by e-mail from Minneapolis to something. And his just subjective view is that her response shows bias. But there's no reasonable objective basis to reach that conclusion. Well, as I understand it, the way the e-mail comes in is under retaliation claim. And whether or not this is distinguished from the lawsuit, which has the 19-month gap, that this was three months before he was laid off. And the issue is whether that was a retaliation. And his comment doesn't focus just on the particular issue. He says, I do not find your approach as, plural, to be free from bias. So it seems to me there's an accusation there that could be interpreted to mean your approach as, plural, meaning the dealings that you've done with me in the past. But again, that's just his subjective comment. There's nothing in the record, no specific substantial evidence from Mr. Girmayas to what these actions were, except for, as I talked about, a couple of accent comments and the like. It's very thin. And you've got to look at it. I think the courts do look at this in context. What he's trying to do is bridge that gap for retaliation and trying to show some sort of pattern of antagonism. Like in the Porter case or McGinnis, those are the recent cases from the 9th Circuit. And it just doesn't exist here. If you look at those cases, all of those cases were ones where there was expressed racial animus or the decision maker was the subject of the previous lawsuit and had an ax to grind and the like. And none of that is true here. And in fact, it's exactly the opposite. Mr. Arditi says, well, Mr. Girmayas had to fight for everything he got at Northwest Airlines. You know, that just isn't what the record shows. What the record shows is that after he filed that lawsuit, he was promoted, he received an award, he got merit pay increases, he got favorable reviews, he got total support, financial and otherwise, in connection with his master's. As you pointed out, it culminated. He's writing this note to Ms. Jones in his own handwriting where he's thanking her, expressing gratitude. I mean, there is no pattern of antagonism. And if you take these couple of comments in the broader context, it just doesn't rise to that level. And they don't cite any cases that get them there. The cases they cite are all ones where, as I said, there are facts that just aren't in this case where there are expressed racial epithets or the like, and it just isn't in this case. So again, I only have a few seconds, but I don't believe that using Karen Klein the way she did somehow suggests pretext. Because I think what it shows is, again, it was her decision how to do it. It was a logical way to do it. The fact that he wouldn't have done it that way is neither here nor there. He would be arguing the opposite. If she had used it and it resulted in a lower score, then he'd be saying, well, that's biased. She did it to compare apples to apples. She thought it was a mistake. There's no evidence to the contrary. There's no evidence of animus. There's nothing in this record relating to race. And on national origin, there are these two alleged comments and nothing else. Thank you, Mr. Davis. Thank you. Mr. Dede, I have about a minute and a half left. Thank you. On the June 28, 2001, email, following that email, Mr. Girmay did talk with Ms. Jones and again complained to her in the context of that email about her comments on his accent. So there was very specific race or national origin content to that. On the pattern of antagonism, there was a period in early 2001 when Mr. Girmay's team was taken away and he went for two months without any job duties whatsoever. And he went to Ms. Jones and said, I have nothing to do but stare at my computer screen. And she said, that's all we want you to do right now. Now, if that is an antagonism toward a motivated employee, I don't know what is. Prior to that, within a month or two after the resolution of the first lawsuit, Ms. Jones took away Mr. Girmay's ability to discipline individuals for attendance, which was the one job duty he had that made him management, that distinguished him. You're on the retaliation issue, but those issues occurred 18 and 28 months before firing, that he had those reductions. Isn't that a little time gap before you get to that? No. When they eliminated his job duties, took away his team, that was in early 2001. The reduction of duties. When they took away his team, yes. Eliminated all of his duties. Well, but he had a pattern of internal complaints in the meantime. So that happened, and he would complain. He'd complain not only about the retaliation, but about the discrimination. And those complaints continued up to within three months of his termination. And the court has held in the Coswalter case that complaints made between three and eight months before the adverse action are sufficiently close to raise an inference of retaliation. And here we have seven internal complaints within three and eight months of the actual layoff. I think I'll end now. Thank you, Your Honor. Thank you. Mr. Diamond, thank you as well. The case is discarded. It is submitted. Next case is 0335906,
judges: Wallace, Silverman, Paez